**NARRATIVE SUMMARY OF THE CASE**

**Ponzi Fraud, Money Laundering and Forfeiture Charges**

All defendants are charged in Count 1 with Conspiracy to commit Mail Fraud, Wire Fraud and Obstruction of Justice, from May 1998 to June 2002. Defendants are alleged to have conspired to falsely tell investors in the Genesis Fund that the investors' monies would be pooled and invested in highly-profitable foreign exchange trading when in reality the funds were not used for any investor trading after May 1998. The defendants diverted the investors' monies to themselves and to make payments to "lull" some investors to believe the Genesis Fund was attaining large profits. In Counts 2 through 10 and in Counts 11 through 18, all defendants are charged with Mail Fraud and Wire fraud, respectively. In Counts 19 through 33, all defendants are charged with Money Laundering Promotion (except LIPTON, LEONARD and PRESTON who are charged only in Counts 30 through 33). In Counts 34 through 61, defendant JOHNSON is charged with Engaging in an Illegal Money Transaction in Criminally Derived Property of Value greater than $10,000. In Counts 62 through 67, defendant NURICK is charged with the same offense. Count 81 charges defendant WILLIAM TAYLOR-FRASER with a willful endeavor, by means of bribery, to obstruct, delay and prevent the communication of information relating to a criminal violation to a criminal investigator. Counts 82 and 83 are forfeiture counts against all defendants, except LIPTON, LEONARD and PRESTON, which relate to Counts 1 through 18 and 19 through 67, respectively. Each of these counts relate to the Ponzi Fraud scheme charged in Count 1 and, indeed, are overt acts, charged and uncharged, of the conspiracy.

**General Nature of the Ponzi Scheme**

The defendants were all principals of a "private" offshore foreign currency trading fund called the Genesis Fund. The Genesis Fund originated in 1994 in Orange County, California, as a pooled investment vehicle, initially called "The Human Element." Although new investors were advised that their investments would be placed into foreign currency trading, since May 1998, the new investor money instead was used to make payments to the principals of the Genesis Fund and a few early investors. In other words, this operated as a classic Ponzi scheme. The Genesis Fund had more than 1,000 investors, mostly from the U.S., whose combined investments totaled approximately $100 million. Total losses of investor principal are estimated at approximately $60 million.

**Control and Operation of Ponzi Scheme**

Although operating in California and elsewhere in the United States, the Genesis Fund was never registered with the Securities

and Exchange Commission ("SEC"). The Fund was controlled by LIPTON and a small group of associates, which over the years included Edward "Jay" Lashlee, VOGT, Michael L. Putnam, JOHNSON, NURICK, PRESTON, WILLIAM TAYLOR-FRASER, DENISE TAYLOR-FRASER, LEONARD, Marlyn "Milt" Hinders, and George H. "Bo" Boeck (the "Program Managers" or "principals"). LIPTON, Putnam, NURICK, PRESTON, and LEONARD moved to Costa Rica during the life of the Genesis Fund, although Putnam and NURICK returned to live in the United States.

**Representations to Investors in Scheme**

Defendants and others identified above solicited new investments for the Fund from the general public in the United States and elsewhere. They also encouraged investors to solicit new investors. Investors who brought in new investors were called "foreign correspondents" or "FCs". As an incentive, an FC would receive a percentage of the profits generated by the new investment. None of the Program Managers or FCs were known to be licensed to sell securities in the United States.

The Genesis Fund claimed that it traded on the foreign exchange market through a currency dealer in Hong Kong and Macau known as International Bright Investment, Ltd. ("IBI"). IBI was headed by Hong Kong citizen Margaret Yim Ting Lam. However, in May 1998, the Program Managers, including defendants, decided to stop sending new investor money to IBI. They did so in response to litigation injunctions ordered against the Genesis Fund by the High Courts of Ireland and Hong Kong, which barred the Genesis Fund from dissipating its liquid assets below $5,000,000. At no time did the Program Managers advise investors about the existence of the injunctions or the decision not to invest the funds as promised.

Out of the $100 million received from investors, only about $7 million was actually used for trading. The traders, all located in the United States, have stated that their trading was wholly unsuccessful, as LIPTON and others well knew. The monthly earnings' figures were chosen by LIPTON, and the investors' monthly account statements did not account for the overall trading losses. Investors were not provided with any tax reporting documents, and the Genesis Fund filed no paperwork of any kind with the IRS.

The Fund promoters, including defendants, and literature made a number of other false and fraudulent statements to attract new investors. The literature falsely claimed that its investors received an average return of roughly 4% per month with never a losing month. It also claimed that the Genesis Fund employed three accountants whose monthly review "emulated a monthly audit," when in fact it employed no accountants and conducted no audits. The promoters and the literature also falsely claimed that, as a security measure, the Genesis Fund only invested 50% of the funds

at any one time, keeping the other 50% in reserve with IBI in offshore bank accounts.

The defendants and others identified above structured the Fund to create significant incentives for investors to keep their money in the Fund. The Fund paid higher "returns" for those investors who kept their principal investment in the Fund for a longer period of time. The Program Managers actively encouraged investors to commit their funds for the maximum ten years. The Program Managers discouraged ordinary investors from withdrawing funds by implementing complicated rules that required advance notice of withdrawal, in some cases over one year in advance. Thus, ordinary investors had strong incentives to reinvest their earnings in the Fund rather than take withdrawals.

**Efforts to Thwart Investigation of the Scheme**

In an effort to avoid detection by federal investigators, over the years defendants and others identified herein created or used a number of different entities to obscure the operations of the Fund, including the following: Professional Trust Services, Centrix Management, International Centrix Management, Currency Trading Management Group (also known as CTMG), Commodity Trading Management Group (also known as CTMG), Harrow Management, S.A., Servicios de Manejo Centrix S.A., and IMORG. In 2000, the Genesis Fund, previously described as an "equity partnership" and an "Irish trust," was purportedly incorporated in Nevis as the "Genesis Fund, Ltd." An entity called Roger Smyth, Ltd., was named as nominee Director/Secretary. However, the Program Managers remained in charge of the Fund's operations at all times.

**Collapse of the Ponzi Scheme**

By the spring of 2002, Genesis Fund managers told investors that the Fund's total value, including earnings, had grown to approximately $1.3 billion. In June 2002, however, the Fund suddenly notified investors that no new money would be accepted, that all payments from the Genesis Fund were suspended, and that trading activity had ceased. In several letters sent to investors in July 2002, representatives of the Genesis Fund stated that the Fund had exhausted all of its capital reserves, but assured investors that their equity was still "there." At that time, the Program Managers, including defendants, knew that the Fund was worth dramatically less than what they had previously claimed (less than $300,000), and the likelihood of any meaningful recovery was nil.

In the summer and fall of 2002, LIPTON, the other defendants and co-conspirators constructed an "equity recovery plan" that they claimed could recoup the losses incurred by investors. The purpose

of the plan appears to have been three-fold: to discourage investors from initiating litigation against the Fund, to discourage investors from reporting the Fund to law enforcement authorities, and to provide a mechanism by which the Program Managers could remove themselves from the Genesis Fund management, being replaced by investors to advise the Fund. The plan provided that, using the remaining Genesis funds in Hong Kong, worth approximately $2 million, a new investment vehicle would be located and used to earn up to 8% per month return. The earnings would then be used to repay investors their losses of principal, but not earnings. LIPTON also told investors that if litigation was avoided, he had a benefactor willing to devote $25 million as seed capital for the new venture.

The Program Managers, including the defendants, advised investors that they either could vote to approve the plan or receive pennies on the dollar (less)  In an October 2002 shareholders meeting in Mexico City, investors voted to approve the plan and elected a new "Shareholder Oversight Committee" or "SOC," composed of approximately a dozen investors, Bo Boeck, and W. TAYLOR-FRASER. Meanwhile, the rest of the Program Managers conveniently faded from view. Boeck and W. TAYLOR-FRASER spent much of their time on the SOC convincing its members not to audit the Genesis Fund or spend any energy in determining the reason for the Fund's collapse.[1] W. TAYLOR-FRASER resigned from the SOC in January 2003, citing liability concerns. The purported recovery plan was completely unsuccessful.

### Money Flows in Scheme

From 1994 through September 1999, investments and distributions flowed through bank accounts located in Orange County, California, primarily at Wells Fargo Bank, Laguna Beach, California. LIPTON orchestrated the transfer of Genesis administrative operations to Costa Rica in the late 1999/early 2000 time period. Costa Rican attorney Arnoldo André Tinoco ("André ") and his law firm of André Tinoco & Asociados in San José oversaw the Fund administration from late 1999 through late 2001. Vera Esquivel, a firm employee, provided the daily administrative

---

[1] The SOC had five American members who live in Costa Rica, a number of whom are hostile to the IRS. Those members dominated the SOC, and issued letters containing misleading and false information that appear to be influenced by LIPTON. The U.S.-based members were unsuccessful in attempts to obtain information about the Fund's operations, causing all of the SOC members residing in America to resign save one. The remaining one was then shut off from SOC communications because of his cooperation with the investigation.

services to the Genesis Fund with the continued assistance of Program Manager VOGT. André also provided incorporation and private banking services for most of the targets of the investigation. André is believed to have formed and used Harrow Management, S.A., and Servicios de Manejo Centrix, S.A., on behalf of the Genesis Fund.

From late 1999 through late 2001, investor funds and distributions flowed through a number of accounts in Costa Rica at Banco Elca, Banco Nacional de Costa Rica, Banco Interfin, Banco de San José, Banco Aleman Platina, Bantec International, Banco BFA (now Banco Cuscatlan), Banco Uno, and Dresdner Bank Lateinamerika. In late 2001, LIPTON arranged for new investor funds and distributions to flow through HSBC (incoming) and Wing Hang Bank (outgoing) in Hong Kong, which were opened and controlled by an associate of IBI's Margaret Lam.

### Obstruction Charges

Several defendants - LIPTON, VOGT, and W. TAYLOR-FRASER - acted to obstruct the grand jury investigation. LIPTON and VOGT, along with Michael Putnam, shipped 19 boxes of Genesis Fund documents responsive to a grand jury subpoena, rather than produce them to the grand jury. In addition, LIPTON arranged to have at least one of VOGT's computers wiped of data prior to its production to the grand jury. After March 2000, LEONARD learned from LIPTON and André that LIPTON and VOGT had transferred the records of Genesis Fund to Costa Rica

Finally, in November 2002, W. TAYLOR-FRASER caused $50,000 to be paid to an investor in an attempt to prevent the investor from reporting the Genesis Fund's activities to the FBI.

### Tax Fraud and Obstruction Charges in the Indictment

Count 68 charges all defendants with Conspiracy to defraud the Department of the Treasury, from July 1994 to at least May 2005, by using alleged "asset protection" trusts, sold by co-conspirator Lashlee, to conceal the receipt of income from the Genesis Fund in order to impede, impair, obstruct, and defeat the lawful functions of the IRS in the ascertainment, computation, assessment and collection of individual income taxes of the defendants and certain clients of the Genesis Fund. Defendants further promoted the Genesis Fund to others as an entity that had no reporting obligations to the IRS and engaged the services of a co-conspirator, Costa Rican attorney André, to create nominee corporations in Costa Rica. Counts 71, 72 and 75, charge defendant JOHNSON with income tax evasion for the years 1997, 1998 and 2001, respectively; Counts 73 and 74 charge him with subscribing and

filing a false and fraudulent tax return for 1999 and 2000, respectively; and finally, Count 76 charges this defendant with failing to pay income taxes for 2002. Count 77 charges defendant NURICK with tax evasion for 1995. Count 80 charges defendant VOGT with obstructing a federal grand jury.[2] Each of these counts relates to the conspiracy to defraud the Treasury set forth in Count 68 and, indeed, are overt acts, charged and uncharged, of the conspiracy.[3]

**Defrauding the Internal Revenue Service**

The Genesis Fund principals, including the defendants, profited greatly from distributions of investor funds. They are believed to have received at least $14 million in total, funding lavish lifestyles. Federal taxes were usually not paid on these withdrawals. LIPTON and LEONARD are longtime non-filers and hostile to the IRS. The defendants, including LIPTON, and others, agreed to create "disclosed" Genesis Fund accounts in order to report to the IRS some, but not all, Genesis Fund distributions. The "undisclosed" accounts had been established before 1999 and were not to be reported to the IRS.

In early 1999, after learning of investigation of Lashlee by the IRS, LIPTON, JOHNSON, LEONARD, NURICK and PRESTON established and used Costa Rican corporations through André and other attorneys to conceal the receipt of income and ownership of assets from the IRS. Hinders also later established a corporation called Propriedades Ecamu, S.A. Defendants, including LEONARD, also caused André to obtain credit cards supported by these accounts for the purpose of obtaining Genesis Fund distributions placed into the accounts. These Costa Rican corporations and related bank accounts were established for the purpose of receiving Genesis Fund income in order to evade reporting income to the IRS. The name of the corporation LEONARD used for this purpose was Abetos Del Bosque Lluvioso S.A. at Banco Interfin. In addition, LEONARD and others recommended to some Genesis Fund investors that they use the services of the same Costa Rican lawyer to create Costa Rican corporations and bank accounts in order to receive distributions from the Genesis Fund. The defendants, including LEONARD, did not fully report their Genesis Fund income on their personal returns,

---

[2] This charge was dismissed against defendant LIPTON only on May 29, 2008.

[3] Count 69 was dismissed against defendant LIPTON on May 29, 2008. Count 70 charges only defendant HINDERS who is a fugitive. Counts 78 and 79 were dismissed against defendant PRESTON on June 9, 2008.

and no tax returns were filed on behalf of the trusts.

Each of the targets, with the exception of the TAYLOR-FRASERS, used a bank account in the name of a trust opened by Lashlee to receive Genesis distributions. No trust returns were filed for those trusts. VOGT was responsible each month for creating the distribution list for funds and causing the funds to be disbursed to the others' nominee accounts. Each of the trusts were used to receive distributions from the Genesis Fund through bank accounts at Wells Fargo Bank, Laguna Beach, California, and Paine Webber, among others. Some of those trusts were:

(a) LIPTON:    JSL Account Trust
               BRL Account Trust
(b) Hinders:   Mint Control Trust
(c) JOHNSON:   Cow Account Trust
(d) LEONARD:   Ortega Management Trust
(e) NURICK:    I-Control NB Trust
(f) PRESTON:   Stone Mountain Account Trust
(g) VOGT:      T-Volt Account Trust.

As noted above, after March 2000, LEONARD learned from LIPTON and the Costa Rican attorney that LIPTON and VOGT had transferred the records of Genesis Fund to Costa Rica.

## 26 U.S.C. § 7201: Leonard's Individual Tax Evasion

Co-conspirator Lashlee opened bank accounts for LEONARD and others, including some Genesis Fund investors, in the names of trusts into which distributions from the Genesis Fund were deposited. As noted, the various bank accounts held in trust names or other entities were used by defendants to deposit their Genesis Fund income. LEONARD's corporation was called Abetos Del Bosque Lluvioso S.A. He used that bank account to receive Genesis Fund proceeds, which he could access and make payments to contractors for his luxury home being built in Costa Rica. Several witnesses can testify that Leonard told them that he built his spectacular oceanside house in Costa Rica "all on a $10,000 investment in Genesis." LEONARD also used an account at Paine Webber UBS in the name of Ortega Management Trust to deposit Genesis Fund income. Moreover, he had an account at Banco Interfin in the name of Abetos del Bosque Lluvioso, S.A., which shows well over $1.7 million in deposits in a 25-month period.

During the calendar years 1999 through 2002, LEONARD received income substantially in excess of the minimum filing requirement amount set by the IRS which he did not report to the IRS, and upon which he owed significant individual income taxes for the years 1999 through 2002.

Additionally, LEONARD's conduct was clearly willful. He engaged in a multi-year course of not reporting his income and failing to file tax returns. Had he filed accurate tax returns, he would have had to have disclosed his Costa Rican bank account, reported the income from the Genesis Fund and paid substantial taxes on that income.[4]

### Examples of Leonard's Conduct

Specifically, in furtherance of the conspiracy and to accomplish its objects, and in an attempt to willfully evade the assessment and payment of individual income taxes to the IRS, LEONARD and others committed the following overt and affirmative acts, among others, in the Central District of California and elsewhere, to wit:

1. On January 28, 1999, LEONARD caused International Centrix check #5355 in the amount of $10,000 to be deposited into Account #xx xxx40 51 in the name of Ortega Management Trust at Paine Webber (now UBS Paine Webber).

2. During September 1999, LIPTON moved the Genesis Fund's bank accounts from California to Costa Rica, hiring the co-conspirator Costa Rican attorney and his law firm to handle Genesis fund investor funds.

3. During 2000, LEONARD utilized bank accounts in the name of Abetos Del Bosque Lluvioso S.A., specifically the use of credit cards issued on the accounts.

---

[4] It should also be noted that in addition to moving to Costa Rica in 2000, LEONARD had obtained Grenadian citizenship, apparently as the next place to relocate in his ongoing efforts to avoid detection by the IRS.